## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

PAMELA SUSKE                    :

     Plaintiff,                :
                                            Case No. 3:12cv00051
 vs.                          :

                                             District Judge Walter Herbert Rice
MICHAEL J. ASTRUE,              :      Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,        :

     Defendant.                :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.   INTRODUCTION

Plaintiff Pamela Suske brings this case challenging the Social Security Administration's denial of her applications for Supplemental Security Income (SSI) and Widow's Insurance Benefits (WIB).  This Court has jurisdiction to review the administrative denial of her applications.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #13), the administrative record (Doc. #7), and the record as a whole.

Plaintiff asserted in administrative proceedings that she is eligible to receive SSI

---

[1]  Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

and WIB because she is under a "disability" within the meaning of the Social Security

Act.  In the present case, Plaintiff seeks a reversal of the Administrative Law Judge's

decision, and a remand of this case to the Social Security Administration to correct

certain errors.  In the alternative, Plaintiff seeks an Order reversing the ALJ's decision

and granting her benefits because evidence in the record supporting Plaintiff's disability

is strong, while contrary evidence is weak.  The Commissioner contends that an Order

affirming the ALJ's decision is warranted.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff filed her SSI and WIB applications in November 2008 and December

2008, respectively, asserting that she has been under a "disability" since September 2,

2007.  (*PageID##* 60, 201, 208, 231).  Her prescribed period of widow's benefits started

the date her husband died, July 7, 2007, and ends on July 31, 2014. (*PageID#* 61).

Following initial administrative denials of her applications, Plaintiff received a

hearing before ALJ Carol K. Bowen.  ALJ Bowen later issued a written decision

concluding that Plaintiff was not under a disability, and, therefore, not eligible to receive

SSI or WIB.  (*PageID##* 60-75).

### B.    Plaintiff's Vocational Profile and Testimony

Plaintiff was born in 1958, and has past relevant work experience as a retail store

manager (light exertion and skilled), and a nurse aide (medium exertion and semi-skilled).

2

(*PageID#* 119).  Plaintiff testified at the administrative hearing[2] that she lives with her
mother but plans to move to a camper at her uncle's.  (*PageID#* 91).  At her new
residence, she testified she plans to live with her boyfriend but not her mother.  (*PageID#*
92).  Plaintiff testified she has four adult children.  (*Id.*).  She testified a friend brought
her to the hearing because she does not like to drive any more than she has to.  (*Id.*).
Plaintiff stated she has trouble driving because of concentration issues.  (*Id.*).  Plaintiff
completed one year of college, and at one point was certified as a State Tested Nursing
Assistant.  (*PageID#* 93).  Plaintiff stated she has not worked since September 2007, but
looked for jobs as a State Tested Nursing Assistant, although could not pass the physical
due to the need to lift twenty-five pounds.  (*Id.*).  Plaintiff testified she has numbness in
her hands (although predominantly her right hand) that causes her to drop things; neck
and shoulder pain; right groin pain; lower back pain; and is angry "all the time."
(*PageID#* 93-94*).  She testified she goes to TCN Behavioral Health once a month, and is
currently taking numerous medications.  (*PageID##* 94-95).  Plaintiff testified she also
sees her family doctor, Dr. Gallagher, about once every 4 to 6 weeks.  Plaintiff testified
she is in physical therapy for her neck, shoulder, and lower back pain.  She also testified
she does not believe the medication she takes for her psychological issues helps, although
believes counseling does.  (*PageID#* 97).

As to her activities of daily living, Plaintiff testified that when she gets up in the

---

[2]   Because the alleged errors raised by Plaintiff do not implicate the vocational expert testimony
also presented at the administrative hearing, the Court has not summarized that testimony.

morning it usually takes her "probably close to two hours to get everything moving," because she is really stiff when she wakes up and "[i]t seems like everything hurts." (*PageID#* 97).  Plaintiff stated she will take her medication, read the newspaper, stretch a little bit, then prepare something for breakfast.  (*Id.*).  Plaintiff stated "[i]f I have to do laundry or whatever – I, I take most of the day to do my chores.  It's extremely hard to run a vacuum cleaner.  That just seems to kill my back.  I've changed things I cook.  I don't cook things that I have to stand for long periods.  I usually tend to take a nap in the afternoon.  But I seem to be so tired all the time." (*PageID#* 97-98).  Plaintiff testified an average nap lasts two to three hours.  (*PageID#* 98).  Plaintiff stated her chores around the house consist of cleaning up hair from her dog that sheds, doing the dishes, cooking meals, and doing her laundry.  (*Id.*).  She stated she used to ride the lawnmower to cut the grass but "can't take that vibration," and recently stopped doing so in the summer of 2010.  (*Id.*).  Plaintiff goes to the grocery store and can run errands.  (*Id.*).  Plaintiff testified she enjoys photography and will go to a nearby lake sometimes, especially during the winter, to photograph geese.  (*PageID#* 99-100).  Plaintiff stated she handles her own bills and mail; does not see friends and family very often; does not participate in any kind of clubs, groups, or church; does not go out to eat or to the movies; but uses a computer, e-mail and the Internet.  Plaintiff testified she can walk no more than a block before her legs feel weak, and does not believe she could stand in one place for more than 15 to 20 minutes, or sit in one place for 15 to 30 minutes at a time, because her right leg would go numb or tingly.  (*PageID#* 102-03).

4

Plaintiff testified that she experiences head tremors everyday, and that her left and right shoulder goes numb a couple of times a month. (*PageID##* 105-06). Plaintiff stated climbing stairs causes her pain in her groin, she has problems with her hips, and that she has rectal spasms approximately two times per week that average approximately 30 minutes per episode. (*PageID#* 109). She also has problems with nightmares approximately four or five times a week. (*PageID#* 110). Plaintiff testified that she has panic attacks approximately once a month. (*PageID#* 116). She testified she went camping twice in 2009, and was active in a social group that she met online. (*PageID#* 117).

### C.    <u>Medical Records and Opinions</u>

On February 19, 2007, Plaintiff visited the emergency room at Greene Memorial Hospital complaining of heart palpitations. (*PageID#* 302). The diagnosis was palpitations, and chest x-rays were normal. (*Id.*). On November 22, 2007, Plaintiff against visited the emergency room at Greene Memorial Hospital, complaining of pain in her right ankle and foot after her son dropped wood on it while Plaintiff was cleaning the bottom of her steps. (*PageID#* 299). X-rays were taken and there was no evidence of a fracture. (*Id.*). She was prescribed medication for the pain and provided an ace wrap. (*Id.*).

Progress notes from Reachout Montgomery County, dated August 4, 2008 through October 1, 2008, were also submitted. (*PageID#* 306-08). Plaintiff was treated for scoliosis, chronic obstructive pulmonary disease (COPD), and a urinary tract infection.

5

(*Id.*).

Plaintiff's treating physician, Dr. Jessica Gallagher, provided notes from March 7, 2006, through November 13, 2008, indicating treatment for low back pain, anxiety, and COPD.  (*PageID#* 316-19).  Exams revealed Plaintiff had a decreased range of motion in her shoulders, tenderness, and wheezing.  (*Id.*).  Plaintiff was evaluated on January 8, 2009, by Damian Danopulos, M.D., at the request of the Ohio Bureau of Disability Determination.  (*PageID#* 330).  Dr. Danopulos found that Plaintiff gave a reliable history; suffers from right shoulder pain due to a car accident in 2005; has suffered from low back pain for a long period of time; and was hospitalized three times between 1995 and 1996 for psychiatric issues.  (*PageID#* 330-31).  Dr. Danopulos noted that Plaintiff has not consulted with any mental health specialist since 1998.  (*PageID#* 331).  On exam, Dr. Danopulos noted that Plaintiff's upper and lower extremities revealed full range of motion; her right shoulder revealed normal and painful motions; she had normal gait without ambulatory aids; spine was painless to pressure; was able to get on and off the examining table without difficulty; bilateral straight leg raising was normal; squatting and arising from squatting was normal; lower spine motions were normal and painless; toes and heel gait was normal; and there was no evidence of nerve root compression or peripheral neuropathy.  (*PageID#* 333).  Pulmonary function study also "revealed mild degree obstructive lung disease without restrictive component."  (*PageID#* 334).  Lower spine x-rays showed severe degenerative disease at L5-S1 and mild degenerative disease at L4-L5.  (*Id.*).  Dr. Danopulos diagnosed early emphysema, right shoulder arthralgias,

lumbar spine arthritic changes, urinary tract infection in the past without current complaints, history of irritable bowel syndrome, and circumstantial depression.  (*PageID#* 335).  Dr. Danopulos opined that Plaintiff's "ability to do any work-related activities is affected in a negative way from her early emphysema plus arthralgias in the right shoulder and arthritic changes in her lower lumbo/sacral spine."  (*Id.*).

On January 15, 2009, Plaintiff was evaluated by psychologist Mark Hammerly, Ph.D., at the request of the Ohio BDD.  (*PageID#* 346).  Dr. Hammerly noted that Plaintiff lives with her mother; has been married six times but is currently widowed again; has four adult children; is unemployed and relies on her mother for support.  (*PageID#* 346).  Plaintiff stated she graduated from high school in regular education classes, and attended community college for Radiology but had to drop out after a year because she could no longer afford to attend.  (*PageID#* 347).  She was licensed as a State Tested Nursing Assistant until June 2008.  (*Id.*).  Plaintiff disclosed she had been kidnapped, robbed, and raped while working at a Speedway in 1991, and was hospitalized for psychiatric treatment in 1994.  (*PageID#* 348).

Plaintiff was last employed as an State Tested Nursing Assistant in June 2006, but stated she had to leave because she was taking care of her terminally ill husband and because she could not lift patients anymore.  (*Id.*).  Plaintiff did not report having any problems getting along with people on the job; no problems with work speed, quality, or understanding unrelated to her medical issues.  (*Id.*).  Dr. Hammerly noted that Plaintiff's speech was clear and 100% understandable; her rate of speech was normal and her tone

7

was normal; thought processes seemed to be coherent, goal-directed, and logical.

(*PageID#* 349).  He further opined that Plaintiff's mood seemed downcast and affect was

constricted; expressed feelings of guilt, hopelessness, helplessness, and worthlessness;

and overall she related in a demoralized and irritable manner. (*Id.*).  Plaintiff does not

have panic attacks or agoraphobia; does not show evidence of hallucinations, paranoia, or

delusions.  (*Id.*).   Dr. Hammerly opined that Plaintiff was alert and oriented;

concentration and memory are grossly intact; and has sufficient information, judgment,

and common sense reasoning to live independently and make important decisions

concerning her future.  (*PageID#* 350).

Dr. Hammerly noted that Plaintiff has trouble sleeping due to complaints of pain and

COPD; can clean but takes breaks; tries to cook dinner; watches television; makes her bed;

has a driver's license and is able to drive herself to appointments or can get a ride from her

cousin who lives down the street.  (*Id.*).  Plaintiff was diagnosed with Major Depression,

Recurrent, Moderate, and Anxiety Disorder, NOS, and assigned a GAF of 53.[3] (*PageID#*

352-53).  Dr. Hammerly also noted that claimant's mental ability to relate to others,

including fellow workers and supervisors is moderately impaired, although she would be

able to relate sufficiently to coworkers and supervisors for simple, repetitive tasks, which

---

[3] Health care clinicians perform a Global Assessment of Functioning to determine a person's
psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is,
in general, a snapshot of a person's "overall psychological functioning" at or near the time of the
evaluation.  *See Hash v. Comm'r of Soc. Sec.*, 309 Fed. Appx. 981, 988 n.1 (6th Cir. 2009); *see
also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34.  A GAF
score of 51-60, refers to "moderate symptoms ... or moderate difficulty in social, occupational, or school
functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

do not require complicated or detailed verbal instructions and procedures. (*PageID#* 353). He noted she could relate adequately to her family and store clerks within her activities of daily living, but related poorly to the examiner during the CE, and describes moderate deficits in interpersonal functioning. (*Id.*). Dr. Hammerly concluded Plaintiff's mental ability to understand, remember, and follow instructions is not impaired; ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks is not impaired; and mental ability to withstand the stress and pressures associated with day-to-day work activity is moderately impaired due to Major Depression, Recurrent, Moderated and Anxiety Disorder, NOS. (*PageID#* 353-54). Psychologist Bruce Goldsmith, Ph.D., reviewed Plaintiff's mental health records for the state agency in February 2009. (*PageID#* 357-73). Dr. Goldsmith found Plaintiff has no restriction of activities in daily living; moderate difficulties in maintaining social functioning, as well as in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration. (*PageID#* 367). Dr. Goldsmith opined "[t]he claimant's statements are credible and the CE is given weight. The claimant retains the ability to understand, remember, and carry out moderately complex oral and written job instructions in work settings which do not require strict production or time guidelines, and which involve minimal contact with others." (*PageID#* 373). Kristen Haskins, Psy.D., reviewed the evidence and affirmed Dr. Goldsmith's assessment in June 2009. (*PageID#* 433).

Non-examining physician, Cindi Hill, M.D., reviewed the record on March 10, 2009, at the request of the Ohio BDD, and found that Plaintiff did not have a severe

physical impairment. (*PageID#* 375).

Additional treatment notes submitted by Plaintiff's treating physician, Dr. Gallagher, dated between January 12, 2009, and April 23, 2009, indicate Plaintiff was being seen for right hand pain, decreased energy, COPD, GERD, and fibromyalgia. (*PageID#* 384-388).  Plaintiff underwent a venous doppler for her upper right arm pain, which results were normal.  (*PageID#* 395).  A MRI of Plaintiff's brain, taken January 19, 2009, also was normal.  (*PageID#* 394).  A cardiac stress test performed on May 11, 2009, was negative.  (*PageID#* 391, 393).

Counseling notes from TCN Behavioral Services were also submitted, dating from February 5, 2009, through May 29, 2009.  Plaintiff underwent a diagnostic assessment on February 5, 2009.  (*PageID#* 415-24).  Plaintiff indicated she was depressed for a year after she was raped, and now feels depressed again, cries all the time, feels useless, and has felt this way every day for the past 6-8 months (June – August 2008).  (*PageID#* 422). She stated she felt stressed by her housing situation (living with her mother), financial situation, son's drug use, and her own medical issues.  (*PageID#* 423).  Plaintiff also underwent a psychiatric assessment, in which it was noted her affect was constricted and her mood was depressed; she had decreased concentration and memory; her recent and remote memory was poor and her judgment and insight was poor; she was diagnosed with major depression recurrent, PTSD, and assigned a GAF of 50.[4] (*PageID#* 414-15).

---

[4] A GAF of 50 generally refers to a person with "serious symptoms . . . or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep job) . . . ." Diagnostic and

On June 25, 2009, non-examining psychologist, Dr. Kristen Haskins, affirmed Dr. Goldsmith's assessment.  (*PageID#* 433).  Non-examining physician, Dr. Esberdado Villaneuva, reviewed the record on July 10, 2009, and also found no severe impairment. (*PageID#* 434).

Office notes submitted by Plaintiff's treating physician, Dr. Gallagher, dated April 30, 2007 through March 21, 2011, indicate Plaintiff was treated for sinusitis, bronchitis, migraine, arthritis, chest pain, left and right shoulder pain, hip pain, back pain, groin pain, and fatigue.  (*PageID#* 433-52, 456-57, 532-34, 536-38, 540-42).  Dr. Gallagher performed a pain evaluation in April 2009.  (*PageID#* 547).  Dr. Gallagher diagnosed fibromyalgia.  (*Id.*).  Chest x-rays revealed mild scoliotic curve, and left shoulder x-ray revealed mild hypertrophic changes.  (*PageID#* 453-54).

Plaintiff treated at TCN Behavioral from June 3, 2009, through March 9, 2011, and was treated with supportive cognitive therapy and medications.  Psychiatrist, Dr. Frank Halley, and registered nurse, Bobbie Fussichen, completed a mental impairment questionnaire on November 28, 2010, and October 20, 2010, respectively.  (*PageID#* 511). Plaintiff was seen every one to two months, and given a GAF of 50.  The evaluation noted that Plaintiff had sleep disturbance; mood disturbances; difficulty thinking or concentrating; blunt, flat or inappropriate affect; decreased energy; hostility and irritability; and a prognosis of "guarded."  (*PageID#* 510-11).  It was marked on the evaluation that Plaintiff's impairments were expected to last at least twelve months, and

---

Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34.

her psychiatric condition exacerbates her experience of pain and other physical symptoms. (*PageID#* 511).  It was also indicated that Plaintiff would be absent more than three times a month from work; her activities of daily living were moderately restricted; she had marked difficulties in maintaining social functioning; marked deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work setting or elsewhere); and marked episodes of deterioration or decompensation in work.  (*PageID#* 512).  No further explanation was provided.

Plaintiff underwent a CT scan of her hips on February 18, 2011, which indicated the hip joints are well maintained bilaterally, surrounding soft tissue and musculature are unremarkable, but indicated early degenerative joint disease involving both hips. (*PageID#* 514).  Plaintiff was prescribed physical therapy.  (*PageID#* 513).

## III.    ADMINISTRATIVE REVIEW

### A.    "Disability" Defined and the Sequential Evaluation

The Social Security Act provides for the payment of Widow's Insurance Benefits (WIB) to a disabled widow whose husband has died while fully insured.  42 U.S.C. § 402(e).  To qualify for WIB based on a disability, the widow must be unmarried, between the ages of fifty and sixty, be the spouse of a wage earner who dies fully insured, file an application for such benefits, and be under a "disability" as defined in the Social Security Act.  *See* 42 U.S.C. § 402(e)(1); *see also* 20 C.F.R. § 404.335.

The definition of the term "disability" in WIB cases is the same definition of "disability" applied in other cases under Title II of the Social Security Act, such as cases

12

involving claims to Disability Insurance Benefits. To prove such a "disability" the claimant must show that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). This impairment must render the claimant unable to engage in his or her previous work or in any other substantial gainful employment existing in the national economy. 42 U.S.C. § 423(d)(2).

The Social Security Administration provides SSI to indigent individuals, subject to several eligibility requirements. Chief among these, for purposes of this case, is the "disability" requirement. To receive SSI, an applicant must be a "disabled individual." 42 U.S.C. § 1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986). The phrase "disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70. An SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the evaluation answers five questions:

1.      Is the claimant engaged in substantial gainful activity?

2.      Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**B.      The ALJ's Decision**

The ALJ found at Step 1 that Plaintiff had not engaged in substantial gainful activity since her claimed disability onset date of September 2, 2007.  (*PageID#* 63). The ALJ found at Step 2 that Plaintiff has the severe impairments of "fibromyalgia; chronic obstructive pulmonary disease (COPD) with chronic fibrosis changes; major depressive disorder; anxiety disorder; and post-traumatic stress disorder (PTSD)." (*Id.*).

The ALJ determined at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments.  (*Id.*).

At Step 4 the ALJ concluded that the Plaintiff has retained the residual functional

14

capacity to perform light work[5] at all times since her alleged disability onset date, except that she can never climb ladders, ropes or scaffolds; she can only occasionally stoop, kneel, crouch, crawl, or climb ramps or stairs; and she can perform handling, finger, and feeling with the right upper extremity no more than frequently; must avoid exposure to extreme heat, cold, dampness, humidity, chemicals, and other pulmonary irritans, and her job duties must not involve hazardous machinery, unprotected heights or driving. (*PageID# 66*). The ALJ also found Plaintiff to be limited to low stress work, defined as no more than occasional changes in work setting and no strict production quotas or time limits; and no public interaction and only superficial contact with coworkers. (*Id.*).

The ALJ concluded at Step 4 that Plaintiff was not capable of performing her past relevant work as a retail store manager and nurse aide. The ALJ found that Plaintiff's past relevant work was precluded by her RFC. (*PageID#* 73).

The ALJ next found that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform. (*Id.*). This assessment, along with the ALJ's findings throughout her sequential evaluation, led her to ultimately conclude that Plaintiff was not under a disability and hence not eligible for Supplemental Security Income or Widow's Insurance Benefits. (*PageID#* 74).

---

[5]The Regulations define light work as involving the ability to lift " no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §416.967(b).

15

## IV.   JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria." *Bowen v. Comm'r of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)).  It consists of "'more than a scintilla of evidence but less than a preponderance...'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F3d 284, 286 (6th Cir. 1994).  And the required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings.  *Rogers*, 486 F.3d at 241; *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *See Bowen*, 478 F3d at 746.  This occurs, for example, when the ALJ has failed

16

to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V. DISCUSSION

### A. <u>Plaintiff's Contentions</u>

Plaintiff contends the ALJ erred in rejecting the opinions of her treating psychiatrist, Dr. Gallagher, and treating psychiatric nurse, Ms. Fussichen, and instead relying on the opinions of non-examining State agency reviewers. (Doc. #8, *PageID#* 556-63). Plaintiff also argues the ALJ erred in finding that she was not credible in her complaints of disabling pain and that she could perform a reduced range of light work activity. (Doc. #8, *PageID#* 66-67). Defendant contends Plaintiff's arguments lack merit and the ALJ's decision should be affirmed. (Doc. #11, *PageID#* 590).

### B. <u>Medical Source Opinions</u>

#### 1.

#### <u>Treating Medical Sources</u>

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406 (6th Cir. 2009); *see Wilson*, 378 F.3d at 544 (6th Cir. 2004). A treating physician's opinion is given controlling weight only if it is both well supported by medically

17

acceptable data and if it is not inconsistent with other substantial evidence of record.  (*Id.*).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources.  *See* 20 C.F.R. § 404.1527(d)(1).  Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight.  This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p.  Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization.  *See* 20 C.F.R. § 404.927(d), (f); *see also* Ruling 96-6p at *2-*3.

## 2.

## Non-Treating Medical Sources

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in

disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996 WL

374180 at *2.  Yet the Regulations do not permit an ALJ to automatically accept (or reject)

the opinions of a non-treating medical source.  *See id.* at *2-*3.  The Regulations explain,

"In deciding whether you are disabled, we will always consider the medical opinions in

your case record together with the rest of the relevant evidence we receive."  20 C.F.R. §

404.1527(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating

medical source opinions under the factors set forth in § 404.1527(d), including, at a

minium, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. §

404.1527(f); *see also* Ruling 96-6p at *2-*3.

     **C.**     <u>**Analysis**</u>

**1.**

     The opinions on which Plaintiff relied were provided by Dr. Halley and Ms.

Fussichen.  Although Dr. Halley is considered to be an "acceptable medical source" under

the Regulations, the same is not also true regarding Ms. Fussichen, a registered nurse.

Neither licensed nurse practitioners nor mental health counselors are included within the

definition of acceptable medical sources.  20 C.F.R. § 404.1513(a),(d).

     The opinions of such medical sources are not, however, automatically discarded.

Instead, "opinions from non-medical sources who have seen the claimant in their

professional capacity should be evaluated by using the applicable factors, including how

long the source has known the individual, how consistent the opinion is with other

evidence, and how well the source explains the opinion."  *Cruse v. Comm'r of Soc. Sec.*,

503 F.3d 532, 541 (6th Cir. 2007) (discussing in part Social Security Ruling 06-03p, 2006

SSR LEXIS 5, 2006 WL 2329939).

> Although there is a distinction between what an adjudicator must consider and
> what the adjudicator must explain in the disability determination or decision, the
> adjudicator generally should explain the weight given to opinions for these 'other
> sources,' or otherwise ensure that the discussion of the evidence in the
> determination or decision allows a claimant or subsequent reviewer to follow the
> adjudicator's reasoning, when such opinions may have an effect on the outcome of
> the case.

*Cruse*, 502 F.3d at 541 (quoting Soc. Sec. Ruling 06-03p, 2006 SSR LEXIS 5 at *15-*16,

2006 WL 2329939 at *7).

In the present case, the ALJ considered and declined to give dispositive or

deferential weight to Ms. Fussichen and Dr. Halley's assessment. (*PageID#* 72). The ALJ

gave little weight to the assessment as she determined "it is unsupported by objective signs

and findings." In support of this position, the ALJ stated the following:

> As discussed above, Ms. Fussichen initially noted a depressed mood with limited
> concentration and judgment abilities, but she reported improvement in the
> claimant's condition after starting the claimant on Remeron. Further, the claimant
> has been treated at TCN conservatively and on an outpatient basis only. Her
> activities of daily living, even when considering the clarified/minimized version
> provided at the hearing, suggest she functions at a higher level than set forth in this
> assessment.
>
> Although some of the claimant's GAF scores in the record from TCN are at 50 or
> below (Exhibits 14F, page 20 and 22F, page 1), the undersigned notes that the
> global assessment of functioning is only a subjective estimate by a clinician of the
> claimant's status in the preceding two weeks. The undersigned finds that the
> consistency of the higher GAF scores in the record and the preponderance of the
> examination findings from the claimant's treating and examining sources supports a
> reasonable inference that the claimant experiences only moderate difficulties in
> functioning. The preponderance of the medical evidence shows that the claimant
> can perform at least the basic mental demands of unskilled work with the additional

modifications above.

(*PageID#* 72).  Plaintiff argues the ALJ should have provided more weight to Ms. Fussichen and Dr. Halley's assessment.  This argument, however, lacks merit.  Substantial evidence supports the ALJ's finding.

The ALJ explained that "Ms. Fussichen initially noted a depressed mood with limited concentration and judgment abilities, but she reported improvement in the claimant's condition after starting the claimant on Remeron."  (*PageID#* 72).  Indeed, after less than one month, in April 2009, Ms. Fussichen noted that Plaintiff's depression was a little better, and that she said "Remeron is helping."  (*PagerID#* 406).  In May 2009, Plaintiff's depression improved further and she exhibited a full-ranged affect.  (*PageID#* 402).  In June, July, and October 2009, Ms. Fussichen again reported that Plaintiff's mood was euthymic, she exhibited a full-ranged affect, had normal thought processes, as well as fair insight and judgment.  (*PageID##* 492, 499, 504-08).  On June 17, 2009, Nursing Progress Notes even indicate Plaintiff "went to Charlotte over Memorial Weekend for the Nascar race" and "didn't take the Remeron then because [she knew she] wouldn't be up on time."  (*PageID#* 504).

On October 4, 2010, Plaintiff met with Randi Rothman, M.S.S., L.S.W., who noted that she "reports depression, anger and anxiety are still there, but not necessarily worse. She feels down about winter coming and still living with mom.  She almost got a trailer and will continue looking for another one."  (*PageID#* 464).  A few weeks later, on October 20, 2010, Ms. Fussichen completed the mental impairment questionnarie, in which she

21

indicated Plaintiff has moderate restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work setting or elsewhere); and marked episodes of deterioration or decompensation in work.  (*PageID#* 512).  While it is certainly possible Plaintiff's mental condition could have significantly worsened since 2009, and thus supported such extreme findings in the assessment, a thorough review of the medical evidence shows that is not the case here.  In fact, just a few months prior to Ms. Fussichen's assessment, in July 2010, Ms. Fussichen noted that Plaintiff's depression "comes & goes," and reported that Plaintiff was sleeping ok; just returned from visiting her uncle in Virginia, and "enjoyed the time away from home"; and that she dealt with the 3rd anniversary of her husband's death "fine" although "others continue to call her about that date." (*PageID#* 469).  Such notes are also consistent with Ms. Rothman's notes from a year before, in which she noted "Client has a social group she met online over the past three years," and that Plaintiff said the second anniversary of her husband's death "didn't bother her."  (*PageID#* 502).

Moreover, just a few months after Ms. Fussichen completed the assessment (and less than two weeks after Dr. Halley signed off on it), Individual Progress Notes from Ms. Rothman dated December 6, 2010, indicate Plaintiff met with her and reported that "she has been taking photographs and got some published on WHIO website.  She would like to go back to school for photography with [her boyfriend] and do weddings together."  Ms. Rothman also reported that Plaintiff "says Christmas is stressful," because she had the

22

whole family over for Thanksgiving and will be doing so again for Christmas.  (*PageID#* 529).  On March 9, 2011, Ms. Rothman indicated that Plaintiff "has been primary caretaker for her aunt although she has backed off due to her own health issues.  She feels she may have to step back in due to aunt's poor health condition.  Client would like to go back to school if she can get social security and get her health back in order.  Client likes the idea of exploring patient advocacy certificate.  Client has considered being a victim advocate." (*PageID#* 517).

In November 2011, Ms. Rothman reported that in order to "self-soothe" Plaintiff plays online games such as Farmville, Farmtown, Frontierville, and Cityville, for two hours a day; watches soap operas and criminal investigation shows; and reports she "stays active in the house or she would want to sleep all day."  (*PageID#* 525).

To the extent Ms. Fussichen and Dr. Halley's assessment indicates Plaintiff suffers from disabling mental symptoms, the ALJ did not err in determining the medical records do not support this position.  The ALJ provided "good reasons" for providing the assessment "little weight," and her findings are supported by substantial evidence.  Ultimately, the ALJ decided to give great weight to the assessment of Drs. Goldsmith and Haskins, whose opinions were, as the ALJ noted, generally consistent with the medical evidence of record as a whole.  (*PageID#* 70-72).   Plaintiff argues the ALJ erred in doing so, however, the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight.  This occurs because the Commissioner views nonexamining sources "as highly qualified physicians and

psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p.  Consequently, opinions of one-time record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization.  *See* 20 C.F.R. § 404.1572(d), (f).  The ALJ, therefore, did not err in relying on the assessment of Drs. Goldsmith and Haskins.

The ALJ also properly accounted for Plaintiff's moderate limitations in maintaining social functioning because Plaintiff's RFC limited her to "no public interaction and only superficial contact with coworkers."  (*PageID#* 66).  As Defendant properly notes, this "generously accounted for any social limitations she had."  (*PageID#* 584).  The ALJ's determination that Plaintiff would not require restrictions on interaction with a work supervisor is supported by evidence of record, including the fact she indicated she gets along with authority figures "fine" and has never been laid off or fired from a job because of problems getting along with other people.  (*PageID#* 257-258).

**2.**

Plaintiff also contends the ALJ erred in finding that she was not credible in her complaints of disabling pain and that she could perform a reduced range of light work activity.  (*PageID#* 563 (citing *PageID#* 66-67)).  Plaintiff argues the ALJ incorrectly substituted her opinion for that of a competent medical source, the decision is not based on substantial evidence, and should be reversed.

A social security applicant's credibility is evaluated in two parts: "First, the ALJ will

ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (citations omitted). A list of factors — for example, "claimant's daily activities; location, duration, frequency and intensity of symptoms; factors that precipitate and aggravate symptoms...," *id.*, assist the ALJ in evaluating an applicant's symptoms.

The ALJ cited the applicable credibility regulations, namely 20 C.F.R. §§ 404.1529 and 416.929, and accurately described the legal criteria applicable to evaluating Plaintiff's credibility. (*PageID#* 66). In light of this, the ALJ did not err as a matter of law when evaluating Plaintiff's credibility. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007)(describing the applicable legal criteria). The issue, then, is whether substantial evidence supports the ALJ's reasons for not fully crediting Plaintiff's testimony.

"[T]he ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.' Rather, such determinations must find support in the record." *Rogers*, 486 F.3d at 241 (quoting in part Social Security Ruling 96-7p, 1996 SSR LEXIS 4, 1996 WL 374186, at *4). When substantial evidence supports the ALJ's credibility findings, his findings are "accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.

25

1997).

Despite Plaintiff's contentions otherwise, substantial evidence supports the ALJ's credibility determination. The ALJ reasonably found that certain factors undermined Plaintiff's credibility.  (*PageID##* 17-21).  The ALJ wrote:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms.  However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

> The claimant's assertion that she has not been able to work at any time since the alleged disability onset date is not supported by objective medical evidence. Consultative physician Damian Danopulos, M.D., examined the claimant on January 9, 2009, and he reported a relatively normal physical examination. . . . A neurological examination was also normal (Exhibit 5F, pages 4-12).

> When the claimant went to the emergency room for shortness of breath on January 8, 2010, attending physician David Carter, M.D., noted that an examination of the extremities was normal. A neurological examination at that time was also normal (Exhibit 17F, page 4).

> Treatment notes from primary care physician Jessica Gallagher, M.D., generally showed few significant musculoskeletal findings. On April 11, 2007, Dr. Gallagher noted only tenderness and reduced range of motion of the right shoulder, and she noted only mild pain upon movement of the hips on December 6, 2010. On January 24, 2011, Dr. Gallagher stated that an examination revealed only mild hip tenderness and tenderness at the neck, and she noted only right shoulder tenderness and spasms on March 21, 2011. Musculoskeletal and neurological examinations between April 2007 and March 2011 were otherwise normal (Exhibits 4F, pages 5-9; 11F, pages 7-13; 18F, pages 1-10; 20F, pages 1-2; and 25F, pages 1-13).

> . . .

> Treatment notes from primary care physician Jessica Gallagher, M.D., generally reflect only a diagnosis of COPD and show few significant respiratory findings upon examination. She noted only shortness of breath on January 12, 2009, and she noted only decreased breath sounds on December 29, 2010. Musculoskeletal and

26

neurological examinations between April 2007 and March 2011 were otherwise relatively normal (Exhibits 4F, pages 5-9; 11F, pages 7-13; 18F, pages 1-10; 20F, pages 1-2; and 25F, pages 1-13).

. . .

The claimant does have severe mental impairments, but her complaints of disabling mental symptoms are also unsupported by objective medical evidence. Consultative psychologist Dr. Hammerly evaluated the claimant on January 15, 2009, and the claimant disclosed that she had been a victim of abduction and rape in 1991. Dr. Hammerly noted that the claimant exhibited a downcast mood and a restricted affect. However, he otherwise reported full orientation, clear and understandable speech, coherent and logical thought processes, grossly intact concentration and memory, sufficient information and judgment to live independently and make important decisions concerning her future, and no evidence of psychomotor retardation or agitation, motoric signs of anxiety, hallucinations, paranoia, delusions, panic attacks, or suicidal ideation. Moreover, Dr. Hammerly arrived at a GAF (Global Assessment of Functioning) score of 53, which indicates only moderate symptomatology (Exhibit 6F, pages 4-8 and DSM-IV, page 32).

The claimant began treatment with TCN Behavioral Health on February 5, 2009. When Randi Rothman, M.S.S., L.S.W., evaluated the claimant at that time, she arrived at a GAF score of 55. Bobbie Fussichen, R.N., performed an initial psychiatric evaluation on March 11, 2009, and she arrived at a GAF score of 50. However, Ms. Fussichen noted that a mental status examination showed only a depressed mood, a constricted affect, and decreased concentration and memory. The evaluation otherwise showed full orientation, cooperative behavior, normal speech, normal psychomotor activity, logical thought processes, and no evidence of obsessions, hopelessness, hallucinations, delusions, or suicidal ideation. Ms. Fussichen started the claimant on Remeron at that time, and less than one month later, on April 8, 2009, the claimant stated that her depression was somewhat better. After Ms. Fussichen increased the claimant's dosage, she stated on May 13, 2009, that the claimant's depression had again improved and that she exhibited a full-ranged affect (Exhibit 14F, pages 6-29). On June 17, 2009, Ms. Fussichen noted only decreased concentration. She otherwise reported a euthymic mood, a full-ranged affect, normal thought processes, and fair insight and judgment. Ms. Fussichen documented similar findings between August and October of 2009. Although Ms. Fussichen began noting a depressed mood in December 2009, it appears this was largely due to family-related stressors, including caring for her mother. Further, Ms. Fussichen noted improved symptoms after increasing the claimant's Remeron dosage (Exhibits 21F and 24F). Progress notes from the

27

claimant's therapist at TCN generally document no more than a depressed and/or anxious mood and concrete thought processes (Exhibits 14F, 21F, and 24F).

The TCN progress notes show that the claimant has been fairly compliant with treatment and that this treatment has been relatively effective in controlling her symptoms, as she has reported a wide range of daily activities. Although the claimant said she continues to have nightmares, flashbacks, and anger outbursts, the TCN treatment notes indicate that the claimant has a steady boyfriend, that she traveled out of state to see family, and that she has assisted with care for her aunt who apparently has Alzheimer's disease and receives hospice care (Exhibit 21F). She told her therapist that she had some of her photographs published on the local news channel website, she liked playing online computer games, and she was hosting her family's holiday party. She talked about a goal of returning to school but, as of her last appointment, she apparently was having some issues about her living arrangements (Exhibit 24F). She testified at the hearing that she will be moving to another family member's property next month and that her goals is to be a victim's advocate or perhaps study photography.

. . .

The claimant's description of daily activities is inconsistent with her complaints of disabling symptoms and limitations. The claimant told Dr. Hammerly on January 15, 2009, that she shared most of the household duties, including washing dishes, laundry, cooking, cleaning, and grocery shopping, with her mother (Exhibit 6F, page 6). She told her primary care physician on April 29, 2009, that her daughter had given her a Wii fitness/entertainment system and an exercise bicycle (Exhibit llF), and she told her therapist on July 8, 2009, that she had been camping over the weekend (Exhibit 21F). Even when considering the minimized version of the claimant's activities of daily living as reported to the TCN staff, the undersigned finds that the performance of such activities on a regular and continuing basis indicates that the claimant's level of pain and depression does not seriously interfere with her ability to maintain attention and concentration, perform routine tasks, understand and follow simple instructions, and interact with others. Further, the inconsistencies in the statements about her daily activities certainly do not enhance the claimant's credibility that her symptom severity is of a disabling degree.

The undersigned cannot reasonably infer that the claimant stopped working on the alleged onset date solely due to her impairments. The claimant stated in October 2008 that she stopped working in June of 2006 to care for her sick husband (Exhibit 2E, page 2), not because of any alleged disability. Thus, it is reasonable to infer that the claimant's lack of employment is not necessarily due to any disabling

impairments, but could be a matter of choice, at least to some extent.

. . .

(*PageID*## 17-21).  As is evident from the lengthy quotation provided above, the ALJ

thoroughly considered the objective medical evidence; Plaintiff's activities of daily living;

complaints of pain and other symptoms; and Plaintiff's medication and treatment.  The ALJ

noted that consultative physician Dr. Danopulos reported a relatively normal physical

examination (*PageID#* 67); her primary care physician, Dr. Gallagher, "showed few

significant musculoskeletal findings" (*PageID#* 68); respiratory and chest examinations in

the record are also normal (*Id.*); Plaintiff's mental health issues are "largely due to family-

related stressors, including caring for her mother," and Remeron improved her symptoms

(*PageID#* 69); Plaintiff attempted to minimize her activities of daily living as reported to

the TCN staff (*PageID#* 70); and that her "description of daily activities is inconsistent

with her complaints of disabling symptoms and limitations."  (*Id.*).  The ALJ's findings are

supported by substantial evidence, and should be affirmed.  *See Blakely v. Comm'r of Soc.

Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th

Cir. 1986)) ("'The substantial-evidence standard . . . presupposes that there is a zone of

choice within which the decisionmakers can go either way, without interference by the

courts.'  Therefore, if substantial evidence supports the ALJ's decision this Court defers to

that finding 'even if there is substantial evidence in the record that would have supported an

opposite conclusion.'").

Accordingly, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability determination be AFFIRMED; and

2.      The case be terminated on the docket of this Court.

January 17, 2013

                                        s/Sharon L. Ovington
                                       Sharon L. Ovington
                              United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(c), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).